1   Ben F. Pierce Gore
    PIERCE GORE LAW FIRM, PC
2   315 Montgomery Street
    10th Floor
3   San Francisco, CA 94104
    (408) 806-4600
4   piercegore@gmail.com

5   Charles J. LaDuca
    Brendan Thompson
6   CUNEO GILBERT & LADUCA, LLP
    4725 Wisconsin Avenue NW
7   Suite 200
    Washington, DC 20016
8   (202) 789-3960
    charles@cuneolaw.com
9   brendant@cuneolaw.com

10  Charles Barrett
    Daniella Bhadare-Valente
11  Morgan L. Burkett
    NEAL & HARWELL, PLC
12  1201 Demonbreun St.
    Suite 1000
13  Nashville, TN 37203
    (615) 244-1713
14  cbarrett@nealharwell.com
    dbhadare-valente@nealharwell.com
15  mburkett@nealharwell.com

16  *Attorneys for Plaintiff*

17

18                  IN THE UNITED STATES DISTRICT COURT

19          FOR THE NORTHERN DISTRICT OF CALIFORNIA

20
    | | |
    |---|---|
    | STEPHEN L. SEIKEL, individually and on behalf of all others similarly situated, | Case No._____ |
    | Plaintiff, | **CLASS ACTION COMPLAINT** |
    | v. | Jury Trial Demanded |
    | 23ANDME, INC., | |
    | Defendant. | Action Filed:  October 23, 2023 |

21

22

23

24

25

26

27

28

Plaintiff Stephen L. Seikel, by and through counsel, brings this lawsuit against Defendant 23andme, Inc. ("Defendant" or "23andMe") and alleges as to his own acts upon personal knowledge, and as to all other matters upon information and belief.

## SUMMARY OF THE CASE

1. Plaintiff brings this class action against 23andMe for its failure to properly secure and safeguard Plaintiff's and other similarly situated 23andMe customers' sensitive information, including their names, sex, date of birth, genetic results, profile photos, and geographic location ("personally identifiable information" or "PII" and/or "Protected Health Information" or "PHI," collectively "Private Information") as defined by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

2. Defendant is a biotechnology company that creates personalized genetic reports on ancestry, traits, genetic health risks, carrier status (risks of genetic diseases of offspring), and pharmacogenetics.[1] Defendant has more than 14 million customers worldwide.[2]

3. In order to obtain Defendant's services, its customers are required to entrust Defendant with sensitive, non-public Private Information, without which Defendant could not perform its regular business activities. Defendant retains this Private Information for at least as many years and even after the consumer relationship has ended.

4. By obtaining, collecting, using, and deriving a benefit from the Private Information of Plaintiff and Class Members, Defendant assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion.

5. On or about October 6, 2023, Defendant announced that "23andMe customer profile information that they opted into sharing through our DNA Relatives feature, was compiled from individual 23andMe.com accounts without the account users' authorization" (the "Data Breach").

6. In the notice posted to Defendant's website (the "Notice"), 23andMe states:

---

[1] https://www.23andme.com/
[2] https://medical.23andme.com/

We recently learned that certain 23andMe customer profile information that they opted into sharing through our DNA Relatives feature, was compiled from individual 23andMe.com accounts without the account users' authorization.

After learning of suspicious activity, we immediately be an investigation. While we are continuing to investigate this matter, we believe threat actors were able to access certain accounts in instances where users recycled login credentials—that is, usernames and passwords that were used on 23andMe.com were the same as those used on other websites that have been previously hacked.

We believe that the threat actor may have then, in violation of our Terms of Service, accessed 23andMe.com accounts without authorization and obtained information from certain accounts, including information about users' DNA Relatives profiles, to the extent a user opted into that service.[3]

7.       The Notice is deficient for several reasons, including: (1) 23andMe fails to state if they were able to contain or end the cybersecurity threat, leaving victims to fear their Private Information is still insecure; and (2) 23andMe fails to state how the breach occurred.

8.       Defendant failed to adequately protect Plaintiff's and Class Members' Private Information—and failed to even encrypt or redact this highly sensitive information. This unencrypted Private Information was compromised due to Defendant's negligent and/or careless acts and omissions and their utter failure to protect customers' sensitive data. Hackers targeted and obtained Plaintiff's and Class Members' Private Information because of the value associated with exploiting and stealing the identities of Plaintiff and Class Members. The present and continuing risk to victims of the Data Breach will remain for their respective lifetimes.

9.       Plaintiff brings this action on behalf of all persons in the United States, or alternatively Tennessee, whose Private Information was compromised as a result of Defendant's failure to: (i) adequately protect the Private Information of Plaintiff and Class Members; (ii) warn Plaintiff and Class Members of Defendant's inadequate information security practices; and (iii) effectively secure hardware containing protected Private Information using reasonable and effective security procedures free of vulnerabilities and incidents. Defendant's conduct amounts at least to negligence and violates federal and state statutes.

10.     Defendant disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly, or negligently failing to implement and maintain adequate and reasonable

---

[3] *Id.*

measures and ensure those measures were followed by its IT vendors to ensure that the Private Information of Plaintiff and Class Members was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data, even for internal use. As a result, the Private Information of Plaintiff and Class Members was compromised through disclosure to an unknown and unauthorized third party.

11.     Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

12.     Plaintiff and Class Members have suffered injury as a result of Defendant's conduct. These injuries include: (i) invasion of privacy; (ii) lost or diminished value of Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; and (v) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

13.     Plaintiff and Class Members seek to remedy these harms and prevent any future data compromise on behalf of herself and all similarly situated persons whose personal data was compromised and stolen as a result of the Data Breach and who remain at risk due to Defendant's inadequate data security practices.

## PARTIES, JURISDICTION, AND VENUE

14.     Plaintiff is a citizen of the State of Tennessee.  On October 11, 2023, Plaintiff received an email notice from 23andMe informing Plaintiff that his Private Information was included in the Data Breach.

15.     Defendant is a Delaware corporation with its headquarters and principal place of business located at 223 N. Mathilda Ave., Sunnyvale, CA 94086.

16.     The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of

1  interest and costs. The number of class members is over 100, many of whom reside outside the

2  state of California and have different citizenship from 23andMe, including Plaintiff. Thus,

3  minimal diversity exists under 28 U.S.C. §1332(d)(2)(A). This Court has jurisdiction over

4  Defendant because its principal place of business is located in this District.

5      17.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because

6  Defendant's principal place of business is located in this District, a substantial part of the events

7  giving rise to this action occurred in this District, and Defendant has harmed Class Members

8  residing in this District.

9      18.    Pursuant to Civil Local Rule 3-2(c), a substantial part of the events or omissions

10  giving rise to the claims asserted in this action occurred in Santa Clara County, California, and

11  this action should be assigned to the San Jose Division.

**FACTUAL ALLEGATIONS**

### A.    <u>Background of 23andMe</u>

14      19.    According to Defendant's website, "23andMe has more than 14 million customers

15  worldwide. Our Health + Ancestry and Membership services allows individuals to acquire this

16  information from the privacy of their own homes, without medical requisition.[4]

17      20.    As a condition of receiving its services, 23andMe requires that its customers,

18  including Plaintiff and Class Members, entrust it with sensitive personal information, including

19  perhaps the most highly sensitive category of personal information: genetic information.

20      21.    The information held by Defendant in its computer systems or those of its vendors

21  at the time of the Data Breach included the unencrypted Private Information of Plaintiff and Class

22  Members.

23      22.    Defendant promised and represented to its customers, including Plaintiff and Class

24  Members, that the Private Information collected from them as a condition of obtaining services at

25  Defendant would be kept safe, confidential, that the privacy of that information would be

26  maintained, and that Defendant would delete any sensitive information after it was no longer

27  required to maintain it.

---

[4] https://medical.23andme.com/

23.     Indeed, Defendant's Privacy Policy states: "We encrypt all sensitive information and conduct regular assessments to identify security vulnerabilities and threats."[5]

24.     In reliance on Defendant's promises and representations, Plaintiff and Class Members provided their Private Information to Defendant with the reasonable expectation and on the mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

25.     Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their Private Information. Plaintiff and Class Members relied on the sophistication of Defendant to keep their Private Information confidential and securely maintained, to use this information for necessary purposes only, and to make only authorized disclosures of this information. Plaintiff and Class Members value the confidentiality of their Private Information and demand security to safeguard their Private Information.

26.     Defendant had a duty to adopt reasonable measures to protect the Private Information of Plaintiff and Class Members from involuntary disclosure to third parties and to audit, monitor, and verify the integrity of its IT vendors and affiliates. Defendant has a legal duty to keep consumer's Private Information safe and confidential.

27.     Defendant has obligations created by the FTC Act, HIPAA, contract, industry standards, and representations made to Plaintiff and Class Members, to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

28.     Defendant derived a substantial economic benefit from collecting Plaintiff's and Class Members' Private Information. Without the required submission of Private Information, Defendant could not perform the services it provides.

29.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' Private Information from disclosure.

---

[5] https://www.23andme.com/privacy/

**B.**   **The Data Breach**

30.     On or about October 6, 2023, 23andMe posted a notice to the 23andMe website concerning the breach ("Notice"). It states:

> We recently learned that certain 23andMe customer profile information that they opted into sharing through our DNA Relatives feature, was compiled from individual 23andMe.com accounts without the account users' authorization.
>
> After learning of suspicious activity, we immediately began an investigation. While we are continuing to investigate this matter, we believe threat actors were able to access certain accounts in instances where users recycled login credentials-that is, usernames and passwords that were used on 23andMe.com were the same as those used on other websites that have been previously hacked.
>
> We believe that the threat actor may have then, in violation of our Terms of Service, accessed 23andMe.com accounts without authorization and obtained information from certain accounts, including information about users' DNA Relatives profiles, to the extent a user opted into that service.[6]

31.     Omitted from the Notice are the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been explained or clarified to Plaintiff and Class Members, who retain a vested interest in ensuring that their Private Information remains protected.

32.     This "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiff and Class Members of the Data Breach's critical facts. Without these details, Plaintiff and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

33.     Defendant did not use reasonable security procedures and practices appropriate to safeguard the sensitive Private Information it was maintaining for Plaintiff and Class Members, causing the exposure of Private Information, such as encrypting the information or deleting it when it is no longer needed. Moreover, Defendant failed to exercise due diligence in selecting its IT vendors or deciding with whom it would share sensitive Private Information.

34.     The attacker accessed and acquired files Defendant shared with a third party containing unencrypted Private Information of Plaintiff and Class Members, including their

---

[6] https://blog.23andme.com/articles/addressing-data-security-concerns

Social Security numbers and other sensitive information. Plaintiff's and Class Members' Private Information was accessed and stolen in the Data Breach.

35.     Plaintiff further believes their Private Information, and that of Class Members, was subsequently sold on the dark web following the Data Breach, as that is the modus operandi of cybercriminals that commit cyber-attacks of this type. Moreover, following the Data Breach, Plaintiff have each experienced suspicious spam and believe this to be an attempt to secure additional Private Information from each of them.

**C.     Defendant Acquires, Collects, and Stores the Private Information of Plaintiff and the Class.**

36.     As a condition to obtain services at 23andMe, Plaintiff and Class Members were required to give their sensitive and confidential Private Information to Defendant.

37.     Defendant retains and stores this information and derives a substantial economic benefit from the Private Information that they collect. But for the collection of Plaintiff' and Class Members' Private Information, Defendant would be unable to perform its services.

38.     By obtaining, collecting, and storing the Private Information of Plaintiff and Class Members, Defendant assumed legal and equitable duties and knew or should have known that they were responsible for protecting the Private Information from disclosure.

39.     Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and relied on Defendant to keep their Private Information confidential and maintained securely, to use this information for business purposes only, and to make only authorized disclosures of this information.

40.     Defendant could have prevented this Data Breach by properly securing and encrypting the files and file servers containing the Private Information of Plaintiff and Class Members or by exercising due diligence in selecting its IT vendors and properly auditing those vendor's security practices.

41.     Upon information and belief, Defendant promised and represented to Plaintiff and Class Members that it would maintain and protect their Private Information, demonstrating an understanding of the importance of securing Private Information.

42.     Defendant's negligence in safeguarding the Private Information of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

**D.      Defendant Knew or Should Have Known of the Risk that Genetic-Testing Companies Are Particularly Susceptible to Cyber Attacks.**

43.     Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting genetic-testing companies that collect and store Private Information, like Defendant, preceding the date of the breach.

44.     Data thieves regularly target companies like Defendant's due to the highly sensitive information in their custody. Defendant knew and understood that unprotected Private Information is valuable and highly sought after by criminal parties who seek to illegally monetize that Private Information through unauthorized access.

45.     In the third quarter of the 2023 fiscal year alone, 7333 organizations experienced data breaches, resulting in 66,658,764 individuals' personal information being compromised.[7]

46.     In light of recent high profile data breaches at other industry leading companies, including MOVEIt (17.5 Million Records, June 2023), LastPass/GoTo Technologies (30 Million Records, August 2022), Neopets (69 Million Records, July 2022), WhatsApp (500 million records, November 2022), Twitter (5.4 Million records, July 2022), Cash App (8.2 Million Users, April 2022), LinkedIn (700 Million Records, April 2021), Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendant knew or should have known that the PII that it collected and maintained would be targeted by cybercriminals.

47.     As a custodian of Private Information, Defendant knew, or should have known, the importance of safeguarding the Private Information entrusted to it by Plaintiff and Class Members, and of the foreseeable consequences if its data security systems, or those of its vendors,

---

[7] *See* https://www.idtheftcenter.org/publication/q3-data-breach-2023-analysis/

were breached, including the significant costs imposed on Plaintiff and Class Members as a result of a breach.

48.     Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the Private Information of Plaintiff and Class Members from being compromised.

49.     Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's server(s), amounting to potentially thousands of individuals' detailed, Private Information, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

50.     In the Notice, Defendant offers to cover identity monitoring services for a period of 24 months. This is wholly inadequate to compensate Plaintiff and Class Members as it fails to provide for the fact victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft, financial fraud, and it entirely fails to provide sufficient compensation for the unauthorized release and disclosure of Plaintiff and Class Members' Private Information. Moreover, once this service expires, Plaintiff and Class Members will be forced to pay out of pocket for necessary identity monitoring services.

51.     Defendant's offer of credit and identity monitoring establishes that Plaintiff and Class Members' sensitive Private Information *was* in fact affected, accessed, compromised, and exfiltrated from Defendant's computer systems.

52.     The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

53.     The ramifications of Defendant's failure to keep secure the Private Information of Plaintiff and Class Members are long lasting and severe. Once Private Information is stolen fraudulent use of that information and damage to victims may continue for years.

54.     As a genetic-testing company in possession of its customers' and former customers' Private Information, Defendant knew, or should have known, the importance of safeguarding the Private Information entrusted to them by Plaintiff and Class Members and of the

foreseeable consequences if its data security systems were breached. This includes the significant costs imposed on Plaintiff and Class Members as a result of a breach. Nevertheless, Defendant failed to take adequate cybersecurity measures to prevent the Data Breach.

### E.    The Value of Personally Identifiable Information

55.    The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority.[8] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number.[9]

56.    The Private Information of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[10]

57.    For example, Private Information can be sold at a price ranging from $40 to $200.[11] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[12]

58.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information

---

[8] 17 C.F.R. § 248.201 (2013).

[9] *Id.*

[10] Your personal data is for sale on the dark web. Here's how much it costs, DIGITAL TRENDS, Oct. 16, 2019, https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-howmuch-it-costs/

[11] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN, Dec. 6, 2017, https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/

[12] *In the Dark*, VPNOVERVIEW, 2019, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/

compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—names and Social Security numbers.

59.     This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[13]

60.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

61.     The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[14]

**F.     23andMe Failed to Comply with FTC and HIPPA Guidelines.**

62.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.,* 799 F.3d 236 (3d Cir. 2015).

63.     In October 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses. The

---

[13] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT WORLD (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html

[14] Report to Congressional Requesters, GAO, at 29 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf

1  guidelines note that businesses should protect the personal customer information that they keep,

2  properly dispose of personal information that is no longer needed, encrypt information stored on

3  computer networks, understand their network's vulnerabilities, and implement policies to correct

4  any security problems. The guidelines also recommend that businesses use an intrusion detection

5  system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating

6  someone is attempting to hack into the system, watch for large amounts of data being transmitted

7  from the system, and have a response plan ready in the event of a breach.

8      64.    The FTC further recommends that companies not maintain Private Information

9  longer than is needed for authorization of a transaction, limit access to sensitive data, require

10  complex passwords to be used on networks, use industry-tested methods for security, monitor the

11  network for suspicious activity, and verify that third-party service providers have implemented

12  reasonable security measures.

13      65.    The FTC has brought enforcement actions against businesses for failing to

14  adequately and reasonably protect customer data by treating the failure to employ reasonable and

15  appropriate measures to protect against unauthorized access to confidential consumer data as an

16  unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify

17  the measures businesses must take to meet their data security obligations.

18      66.    As evidenced by the Data Breach, 23andMe failed to properly implement basic

19  data security practices and failed to audit, monitor, or ensure the integrity of its vendor's data

20  security practices. 23andMe's failure to employ reasonable and appropriate measures to protect

21  against unauthorized access to Plaintiff' and Class Members' Private Information constitutes an

22  unfair act or practice prohibited by Section 5 of the FTCA.

23      67.    23andMe was at all times fully aware of its obligation to protect the Private

24  Information of its customers yet failed to comply with such obligations. Defendant was also aware

25  of the significant repercussions that would result from its failure to do so.

26      68.    Defendant is a covered Business Associate under HIPAA (45 C.F.R. § 160.103)

27  and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and

28  Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health

Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

69.     Defendant is subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH").[15] *See* 42 U.S.C. § 17921, 45 C.F.R. § 160.103.

70.     HIPAA's Privacy Rule or *Standards for Privacy of Individually Identifiable Health Information* establishes national standards for the protection of health information.

71.     HIPAA's Privacy Rule or *Security Standards for the Protection of Electronic Protected Health Information* establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

72.     HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

73.     "Electronic protected health information" is "individually identifiable health information . . . that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

74.     HIPAA's Security Rule requires Defendant to do the following:

    a.    Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

    b.    Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

    c.    Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

    d.    Ensure compliance by its workforce.

75.     HIPAA also requires Defendant to "review and modify the security measures implemented. . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Defendant is required under HIPAA to "[i]mplement technical policies and procedures for electronic

---

[15] HITECH references and incorporates HIPAA.

information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

76.    HIPAA and HITECH also obligate Defendant to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also 42* U.S.C § 17902.

77.    The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, also requires Defendant to provide notice of the Data Breach to each affected individual "without unreasonable delay and in no case later than 60 days following discovery of the breach.[16]

78.    HIPAA requires a covered entity to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e).

79.    HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of protected health information in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

80.    HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." US Department of Health & Human Services, Security Rule Guidance

---

[16] Breach Notification Rule, U.S. Dep't of Health & Human Services, https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html

1    Material.[17] The list of resources includes a link to guidelines set by the National Institute of

2    Standards and Technology (NIST), which OCR says, "represent the industry standard for good

3    business practices with respect to standards for securing e-PHI." US Department of Health &

4    Human Services, Guidance on Risk Analysis.[18]

5            **G.**      **23andMe Failed to Comply with Industry Standards.**

6            81.    As noted above, experts studying cybersecurity routinely identify institutions as

7    being particularly vulnerable to cyberattacks because of the value of the Private Information

8    which they collect and maintain.

9            82.    Some industry best practices that should be implemented by institutions dealing

10    with sensitive Private Information, like 23andMe, include but are not limited to: educating all

11    employees, strong password requirements, multilayer security including firewalls, anti-virus and

12    anti-malware software, encryption, multi-factor authentication, backing up data, and limiting

13    which employees can access sensitive data. As evidenced by the Data Breach, Defendant failed to

14    follow some or all of these industry best practices.

15            83.    Other best cybersecurity practices that are standard at large institutions that store

16    Private Information include: installing appropriate malware detection software; monitoring and

17    limiting network ports; protecting web browsers and email management systems; setting up

18    network systems such as firewalls, switches, and routers; monitoring and protecting physical

19    security systems; and training staff regarding these points. As evidenced by the Data Breach,

20    Defendant failed to follow these cybersecurity best practices.

21            84.    Defendant failed to meet the minimum standards of any of the following

22    frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation

23    PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5,

24    PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for

25

26

---

[17] http://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html.

[18] https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-riskanalysis/index.html

CLASS ACTION COMPLAINT                    16

Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

85.     Defendant failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

**H.     23andMe Breached Its Duty to Safeguard Plaintiff's and Class Members' Private Information.**

86.     In addition to its obligations under federal and state laws, 23andMe owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. 23andMe owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the Private Information of Class Members.

87.     23andMe breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data and failed to audit, monitor, or ensure the integrity of its vendor's data security practices. 23andMe's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a.     Failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;

b.     Failing to adequately protect customers' Private Information;

c.     Failing to properly monitor its own data security systems for existing intrusions;

d.     Failing to audit, monitor, or ensure the integrity of its vendor's data security practices;

e.     Failing to sufficiently train its employees and vendors regarding the proper handling of its customers Private Information;

f.     Failing to fully comply with FTC guidelines for cybersecurity in violation of the FTCA;

g.     Failing to adhere to industry standards for cybersecurity as discussed above; and

h. Otherwise breaching its duties and obligations to protect Plaintiff and Class Members' Private Information.

88. 23andMe negligently and unlawfully failed to safeguard Plaintiff and Class Members' Private Information by allowing cyberthieves to access its computer network and systems which contained unsecured and unencrypted Private Information.

89. Had 23andMe remedied the deficiencies in its information storage and security systems or those of its vendors and affiliates, followed industry guidelines, and adopted security measures recommended by experts in the field, it could have prevented intrusion into its information storage and security systems and, ultimately, the theft of Plaintiff' and Class Members' confidential Private Information.

## DAMAGES

### A. Common Injuries

90. As a result of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk of identity theft to the Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (c) the loss of benefit of the bargain (price premium damages); (d) diminution of value of their Private Information; (e) invasion of privacy; and (f) the continued risk to their Private Information, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information.

### B. Possible Identify Theft

91. Plaintiff and Class Members are at a heightened risk of identity theft for years to come.

92. The unencrypted Private Information of Class Members will end up for sale on the dark web because that is the *modus operandi* of hackers. In addition, unencrypted Private

Information may fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized individuals can easily access the Private Information of Plaintiff and Class Members.

93.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

94.    Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity—or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

95.    For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data Breaches can be the starting point for these additional targeted attacks on the victim.

96.    One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.[19]

---

[19] Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm, Krebs on Security (Sep. 18, 2014),

97.     With "Fullz" packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on Individuals.

98.     The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

99.     The existence and prevalence of "Fullz" packages means that the Private Information stolen from the data breach can easily be linked to the unregulated data (like driver's license numbers) of Plaintiff and the other Class Members.

100.    Thus, even if certain information (such as driver's license numbers) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

101.    Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

**C.      Loss of Time to Mitigate Risk of Identity Theft and Fraud**

102.    As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet the resource and asset of time has been lost.

https://krebsonsecurity.com/2014/09/ medical-records-for-sale-in-underground-stolen-fromtexas-life-insurance-firm

103.     Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to remedy the harms they have or may experience as a result of the Data Breach, such as contacting credit bureaus to place freezes on their accounts; changing passwords and resecuring their own computer networks; and checking their financial accounts for any indication of fraudulent activity, which may take years to detect.

104.     These efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[20]

105.     These efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[21]

106.     And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[22]

**D.     The Decreasing Value of Private Information**

107.     Private Information is a valuable property right.[23] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber

---

[20] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.

[21] *See* Federal Trade Commission, Identity Theft.gov, https://www.identitytheft.gov/Steps

[22] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," at 2, U.S. GOV'T ACCOUNTABILITY OFFICE, June 2007, https://www.gao.gov/ new.items/d07737.pdf ("GAO Report").

[23] *See*, e.g., Randall T. Soma, et al., Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 RICH. J.L. & TECH. 11, at *3-4 (2009) ("Private Information, which companies obtain at little cost, has quantifiable

thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

108.    An active and robust legitimate marketplace for Private Information exists. In 2019, the data brokering industry was worth roughly $200 billion.[24]

109.    In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[25]

110.    Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[26]

111.    Conversely, sensitive Private Information can sell for as much as $363 per record on the dark web according to the Infosec Institute.[27]

112.    As a result of the Data Breach, Plaintiff's, and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

113.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change, e.g., names and Social Security numbers.

---

value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[24] https://www.latimes.com/business/story/2019-11-05/column-data-brokers.

[25] https://datacoup.com/

[26] Nielsen Computer & Mobile Panel, Frequently Asked Questions, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html

[27] *See* Ashiq Ja, Hackers Selling Healthcare Data in the Black Market, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/

114. Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

115. The fraudulent activity resulting from the Data Breach may not come to light for years.

116. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class Members, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

117. Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, amounting to thousands of individuals' detailed personal information, upon information and belief, and thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

118. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

**E.     Future Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary.**

119. Given the type of targeted attack in this case and sophisticated criminal activity, the type of Private Information involved, and the volume of data obtained in the Data Breach, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and to be purchased by criminals intending to utilize the Private Information for identity theft crimes—*e.g.,* opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

120. Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that her or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the

1    suspected fraud. Fraudulent tax returns are typically discovered only when an individual's

2    authentic tax return is rejected.

3         121.   Consequently, Plaintiff and Class Members are at a present and continuous risk of

4    fraud and identity theft for many years into the future.

5         122.   The retail cost of credit monitoring and identity theft monitoring can cost around

6    $200 a year per Class Member. This is a reasonable and necessary cost to monitor to protect Class

7    Members from the risk of identity theft that arose from Defendant's Data Breach. This is a future

8    cost for a minimum of five years that Plaintiff and Class Members would not need to bear but for

9    Defendant's failure to safeguard their Private Information.

10        **F.**   **Loss of the Benefit of the Bargain**

11        123.   Furthermore, Defendant's poor data security deprived Plaintiff and Class

12   Members of the benefit of their bargain. When agreeing to pay Defendant and/or its agents for

13   products and/or services, Plaintiff and other reasonable consumers understood and expected that

14   they were, in part, paying for the product and/or service and necessary data security to protect the

15   Private Information, when in fact, Defendant did not provide the expected data security.

16   Accordingly, Plaintiff and Class Members received products and/or services that were of a lesser

17   value than what they reasonably expected to receive under the bargains they struck with

18   Defendant.

19                          **CLASS ACTION ALLEGATIONS**

20        124.   Plaintiff bring this action individually and on behalf of the following classes pursuant

21   to Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3).

22        **Nationwide Class**
          All individuals in the United States whose Private Information was
23        disclosed in the Data Breach (the "Class").

24        **Tennessee Subclass**
          All individuals in the State of Tennessee whose Private Information was disclosed
25        in the Data Breach (the "Tennessee subclass").

26        125.   Excluded from the Classes are Defendant and its parents or subsidiaries, any

27   entities in which it has a controlling interest, as well as its officers, directors, affiliates, legal

28   representatives, heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom

this case is assigned as well as their judicial staff and immediate family members.

126.     Plaintiff reserves the right to modify or amend the definition of the proposed Class and Tennessee Subclass, as well as add subclasses, before the Court determines whether certification is appropriate.

127.     The proposed Classes meet the criteria for certification under Fed. R. Civ. P. 23(a), (b) (2), and (b)(3).

128.     <u>Numerosity</u>. The Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, Plaintiff believe that the proposed Class includes thousands of individuals who have been damaged by Defendant's conduct as alleged herein. The precise number of Class Members is unknown to Plaintiff but may be ascertained from Defendant's records.

129.     <u>Commonality</u>. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether 23andMe engaged in the conduct alleged herein;

b. Whether 23andMe's conduct violated the FTCA and HIPAA;

c. When 23andMe learned of the Data Breach;

d. Whether 23andMe's response to the Data Breach was adequate;

e. Whether 23andMe unlawfully shared, lost, or disclosed Plaintiff's and Class Members' Private Information

f. Whether 23andMe failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

g. Whether 23andMe's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

h. Whether 23andMe's data security systems prior to and during the Data Breach were consistent with industry standards;

i. Whether 23andMe owed a duty to Class Members to safeguard their Private information;

j. Whether 23andMe breached its duty to Class Members to safeguard their Private Information;

k.   Whether hackers obtained Class Members' Private Information via the Data Breach;

l.   Whether 23andMe had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiff and the Class Members;

m.   Whether 23andMe breached its duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class Members;

n.   Whether 23andMe knew or should have known that its data security systems and monitoring processes were deficient;

o.   What damages Plaintiff and Class Members suffered as a result of 23andMe's misconduct;

p.   Whether 23andMe's conduct was negligent;

q.   Whether 23andMe was unjustly enriched;

r.   Whether Plaintiff and Class Members are entitled to actual and/or statutory damages;

s.   Whether Plaintiff and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

t.   Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment  of a constructive trust.

130.   <u>Typicality</u>. Plaintiff's claims are typical of those of other Class Members because Plaintiff's Private Information, like that of every other Class Member, was compromised in the Data Breach. Plaintiff's claims are typical of those of the other Class Members because, inter alia, all Class Members were injured through the common misconduct of 23andMe. Plaintiff is advancing the same claims and legal theories on behalf of herself and all other Class Members, and there are no defenses that are unique to Plaintiff. The claims of Plaintiff and those of Class Members arise from the same operative facts and are based on the same legal theories.

131.   <u>Adequacy of Representation.</u> Plaintiff will fairly and adequately represent and protect the interests of Class Members. Plaintiff's counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

132.   <u>Predominance</u>. 23andMe has engaged in a common course of conduct toward Plaintiff and Class Members in that all of Plaintiff and Class Members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common

issues arising from 23andMe's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

133.   Superiority. A class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for 23andMe. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

134.   Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2). 23andMe has acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate to the Class as a whole.

135.   Finally, all members of the proposed Class are readily ascertainable. 23andMe has access to the names and addresses and/or email addresses of Class Members affected by the Data Breach. Class Members have already been preliminarily identified and sent Notice of the Data Breach by 23andMe.

## COUNT I

## NEGLIGENCE AND NEGLIGENCE PER SE

136.   Plaintiff restates and realleges all of the allegations stated above as if fully set forth herein.

137.   Defendant requires its customers, including Plaintiff and Class Members, to submit non-public PII in the ordinary course of providing its financial services.

138.    Defendant gathered and stored the PII of Plaintiff and Class Members as part of its business of soliciting its services to its clients and its clients' customers, which solicitations and services affect commerce.

139.    Plaintiff and Class Members entrusted Defendant with their PII with the understanding that Defendant would safeguard their information.

140.    Defendant had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and Class Members could and would suffer if the PII were wrongfully disclosed.

141.    By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to exercise due diligence in selecting IT vendors and to audit, monitor, and ensure the integrity of its vendor's systems and practices and to give prompt notice to those affected in the case of a data breach.

142.    Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

143.    Defendant's duty to use reasonable security measures also arose under the GLBA, under which they were required to protect the security, confidentiality, and integrity of customer information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards.

144.    Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the PII.

145.    Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Corebridge and Plaintiff and Class Members. That special relationship arose because Plaintiff and the Class entrusted Corebridge with their

1   confidential PII, a necessary part of being customers of Defendant.

2       146.    Defendant's duty to use reasonable care in protecting confidential data arose not

3   only as a result of the statutes and regulations described above, but also because Defendant is

4   bound by industry standards to protect confidential PII.

5       147.    Defendant was subject to an "independent duty," untethered to any contract

6   between Defendant and Plaintiff or the Class.

7       148.    Defendant also had a duty to exercise appropriate clearinghouse practices to

8   remove former customers' PII it was no longer required to retain pursuant to regulations.

9       149.    Moreover, Defendant had a duty to promptly and adequately notify Plaintiff and the

10  Class of the Data Breach.

11      150.    Defendant had and continues to have a duty to adequately disclose that the PII of

12  Plaintiff and the Class within Defendant's possession might have been compromised, how it was

13  compromised, and precisely the types of data that were compromised and when. Such notice is

14  necessary to allow Plaintiff and the Class to take steps to prevent, mitigate, and repair any identity

15  theft and the fraudulent use of their PII by third parties.

16      151.    Defendant breached its duties, pursuant to the FTC Act, GLBA, and other

17  applicable standards, and thus was negligent, by failing to use reasonable measures to protect

18  Plaintiff's and Class Members' PII. The specific negligent acts and omissions committed by

19  Defendant include, but are not limited to, the following:

20          a.      Failing to adopt, implement, and maintain adequate security measures to
                    safeguard Plaintiff's and Class Members' PII;
21

22          b.      Failing to adequately monitor the security of their networks and systems;

23          c.      Failing to audit, monitor, or ensure the integrity of its vendor's data
                    security practices;

24          d.      Allowing unauthorized access to Plaintiff's and Class Members' PII;

25          e.      Failing to detect in a timely manner that Plaintiff's and Class Members' PII
                    had been compromised;
26

27          f.      Failing to remove former customers' PII it was no longer required to retain
                    pursuant to regulations; and

28          g.      Failing to timely and adequately notify Plaintiff and Class Members about

the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

152.  Defendant violated Section 5 of the FTC Act and GLBA by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

153.  Plaintiff and Class Members were within the class of persons the Federal Trade Commission Act and GLBA were intended to protect, and the type of harm that resulted from the Data Breach was the type of harm these statues were intended to guard against.

154.  Defendant's violation of Section 5 of the FTC Act and GLBA constitutes negligence *per se*.

155.  The FTC has pursued enforcement actions against businesses, which, as a result of its failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

156.  A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

157.  It was foreseeable that Defendant's failure to use reasonable measures to protect Plaintiff and Class Members' PII would result in injury to Plaintiff's and Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the financial industry.

158.  Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and the Class could and would suffer if the PII were wrongfully disclosed.

159.  Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the PII of Plaintiff and the Class, the critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored on

1    Defendant's systems.

2         160.    It was therefore foreseeable that the failure to adequately safeguard Plaintiff and

3    Class Members' PII would result in one or more types of injuries to Plaintiff and Class Members.

4         161.    Plaintiff and the Class had no ability to protect their PII that was in, and possibly

5    remains in, Defendant's possession.

6         162.    Defendant was in a position to protect against the harm suffered by Plaintiff and the

7    Class as a result of the Data Breach.

8         163.    Defendant's duty extended to protecting Plaintiff and the Class from the risk of

9    foreseeable criminal conduct of third parties, which has been recognized in situations where the

10   actor's own conduct or misconduct exposes another to the risk or defeats protections put in place

11   to guard against the risk, or where the parties are in a special relationship. *See* Restatement

12   (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of

13   a specific duty to reasonably safeguard personal information.

14        164.    Defendant has admitted that the PII of Plaintiff and the Class was wrongfully lost

15   and disclosed to unauthorized third persons as a result of the Data Breach.

16        165.    But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and

17   the Class, the PII of Plaintiff and the Class would not have been compromised.

18        166.    There is a close causal connection between Defendant's failure to implement

19   security measures to protect the PII of Plaintiff and the Class and the harm, or risk of imminent

20   harm, suffered by Plaintiff and the Class. The PII of Plaintiff and the Class was lost and accessed

21   as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII

22   by adopting, implementing, and maintaining appropriate security measures.

23        167.    As a direct and proximate result of Defendant's negligence, Plaintiff and the Class

24   have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) lost

25   or diminished value of PII; (iii) lost time and opportunity costs associated with attempting to

26   mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) and

27   increase in spam calls, texts, and/or emails; and (vi) the continued and certainly increased risk to

28   their PII, which: (a) remains unencrypted and available for unauthorized third parties to access

and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

168.   As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

169.   Additionally, as a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

170.   Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

171.   Defendant's negligent conduct is ongoing, in that it still holds the PII of Plaintiff and Class Members in an unsafe and insecure manner.

172.   Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## <u>COUNT II</u>

### BREACH OF IMPLIED CONTRACT

173.   Plaintiff restates and realleges all of the allegations stated above as if fully set forth herein.

174.   Plaintiff and Class Members were required to provide their PII to Defendant as a condition of receiving insurance, financial, and/or other services from Defendant.

175.   Plaintiff and the Class entrusted their PII to Defendant. In so doing, Plaintiff and the Class entered into implied contracts with Defendant by which Defendant agreed to safeguard and

protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and the Class if their data had been breached and compromised or stolen.

176.    In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

177.    Implicit in the agreement between Plaintiff and Class Members and the Defendant to provide PII, was the latter's obligation to: (a) use such PII for business purposes only, (b) take reasonable steps to safeguard that PII, (c) prevent unauthorized disclosures of the PII, (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII, (e) reasonably safeguard and protect the PII of Plaintiff and Class Members from unauthorized disclosure or uses, (f) retain the PII only under conditions that kept such information secure and confidential.

178.    The mutual understanding and intent of Plaintiff and Class Members on the one hand, and Defendant, on the other, is demonstrated by their conduct and course of dealing.

179.    Defendant solicited, offered, and invited Plaintiff and Class Members to provide their PII as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their PII to Defendant.

180.    In accepting the PII of Plaintiff and Class Members, Defendant understood and agreed that it was required to reasonably safeguard the PII from unauthorized access or disclosure.

181.    On information and belief, at all relevant times Defendant promulgated, adopted, and implemented written privacy policies whereby it expressly promised Plaintiff and Class Members that it would only disclose PII under certain circumstances, none of which relate to the Data Breach.

182.    On information and belief, Defendant further promised to comply with industry standards and to make sure that Plaintiff's and Class Members' PII would remain protected.

183.    Plaintiff and Class Members paid money and provided their PII to Defendant with

the reasonable belief and expectation that Defendant would use part of its earnings to obtain adequate data security. Defendant failed to do so.

184.    Plaintiff and Class Members would not have entrusted their PII to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

185.    Plaintiff and Class Members would not have entrusted their PII to Defendant in the absence of their implied promise to monitor their computer systems and networks to ensure that it adopted reasonable data security measures.

186.    Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

187.    Defendant breached the implied contracts it made with Plaintiff and the Class by failing to safeguard and protect their personal information, by failing to delete the information of Plaintiff and the Class once the relationship ended, and by failing to provide accurate notice to them that personal information was compromised as a result of the Data Breach.

188.    As a direct and proximate result of Defendant's breach of the implied contracts, Plaintiff and Class Members sustained damages, as alleged herein, including the loss of the benefit of the bargain.

189.    Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

190.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

## <u>COUNT III</u>

### UNJUST ENRICHMENT

191.    Plaintiff restates and realleges all of the allegations stated above as if fully set forth herein.

192.    Plaintiff and Class Members conferred a monetary benefit on Defendant.

Specifically, they paid for services from Defendant and/or its agents and in so doing also provided Defendant with their PII. In exchange, Plaintiff and Class Members should have received from Defendant the services that were the subject of the transaction and should have had their PII protected with adequate data security.

193.    Defendant knew that Plaintiff and Class Members conferred a benefit upon it and has accepted and retained that benefit by accepting and retaining the PII entrusted to it. Defendant profited from Plaintiff's and Class Member's retained data and used Plaintiff's and Class Members' PII for business purposes.

194.    Defendant failed to secure Plaintiff and Class Members' PII and, therefore, did not fully compensate Plaintiff or Class Members for the value that their PII provided.

195.    Defendant acquired the PII through inequitable record retention as it failed to disclose the inadequate data security practices previously alleged.

196.    If Plaintiff and Class Members had known that Defendant would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their PII, they would not have entrusted their PII to Defendant or obtained services from Defendant.

197.    Plaintiff and Class Members have no adequate remedy at law.

198.    Under the circumstances, it would be unjust for Defendant to be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon it.

199.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) lost or diminished value of PII; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) and increase in spam calls, texts, and/or emails; and (vi) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

200.    Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

201.    Plaintiff and Class Members may not have an adequate remedy at law against Defendant, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

## COUNT IV

## VIOLATION OF TENN. CODE ANN. § 27-18-2107

## (On Behalf of the Tennessee Subclass)

202.    Plaintiff restates and realleges all of the allegations stated above as if fully set forth herein.

203.    Defendant engaged in the conduct alleged in this Complaint through transactions in and involving trade and commerce. Mainly, Defendant obtained Plaintiff and Class Members' PII through advertising, soliciting, providing, offering, and/or distributing goods and services to Plaintiff and Class Members and the Data Breach occurred through the use of the internet, an instrumentality of interstate commerce.

204.    As alleged herein this Complaint, Defendant engaged in unfair or deceptive acts or practices in the conduct of consumer transactions, including, among other things, the following:

        a.    Failure to implement adequate data security practices to safeguard PII;

        b.    Failure to audit, monitor, or verify the integrity of data security procedures implemented by third parties with whom Defendant shared PII;

        b.    Failure to make only authorized disclosures of current and former customers' PII;

        c.    Failure to disclose that their data security practices were inadequate to safeguard PII from theft; and

        d.    Failure to timely and accurately disclose the Data Breach to Plaintiff and Class members.

205.    Defendant's actions constitute unconscionable, deceptive, or unfair acts or

practices because, as alleged herein, Defendant engaged in immoral, unethical, oppressive, and unscrupulous activities that are and were substantially injurious to Defendant's current and former customers. Plaintiff and Class members relied on Defendant to reasonably protect their PII and had no ability to influence Defendant's data security practices or verify that such practices were appropriate to the nature and sensitivity of PII collected and shared.

206.    In committing the acts alleged above, Defendant engaged in unconscionable, deceptive, and unfair acts and practices acts by omitting, failing to disclose, or inadequately disclosing to Defendant's current and former customers that they did not follow industry best practices for the collection, use, sharing, and storage of PII.

207.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class members have been harmed and have suffered damages including, but not limited to: (i) invasion of privacy; (ii) lost or diminished value of PII; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) and increase in spam calls, texts, and/or emails; and (vi) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

208.    As a direct and proximate result of the unconscionable, unfair, and deceptive acts or practices alleged herein, Plaintiff and Class Members have been damaged and are entitled to recover an order providing declaratory and injunctive relief and reasonable attorneys' fees and costs, to the extent permitted by law.

209.    Also, as a direct result of Defendant's knowing violation of the Tennessee Unfair and Deceptive Trade Practices Act, Plaintiff and Class Members are entitled to injunctive relief, including, but not limited to:

a.      Ordering that Defendant implement measures that ensure that the PII of Defendant's current and former customers is appropriately encrypted and safeguarded when stored on Defendant's network or systems;

b.      Ordering that Defendant purge, delete, and destroy in a reasonable secure

manner PII not necessary for their provision of services;

c. Ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

d. Ordering Defendant to meaningfully educate its current and former customers about the threats they face as a result of the accessibility of their PII to third parties, as well as the steps Defendant's current and former customers must take to protect themselves.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Stephen L. Seikel on behalf of himself and Class Members, request judgment against Defendant and that the Court grants the following:

A. For an Order certifying this action as a class action and appointing Plaintiff and his counsel to represent the Class and Tennessee Subclass, pursuant to Federal Rule of Civil Procedure 23;

B. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Member;

C. For injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

i. Prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii. requiring Defendant to protect, including through encryption, all data collected through the course of their business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii. requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv. requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the Private Information of Plaintiff and Class Members;

v.      prohibiting Defendant from maintaining the Private Information of Plaintiff and Class Members on a cloud-based database;

vi.     requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii.    requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.   requiring Defendant to audit, test, and train their security personnel regarding any new or modified procedures; requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

ix.     requiring Defendant to conduct regular database scanning and securing checks;

x.      requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xi.     requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xii.    requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiii.   requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xiv.    requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xv.     requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

xvi.     for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment.

D.     For an award of actual damages, compensatory damages, and nominal damages in an amount to be determined, as allowable by law;

E.     For an award of punitive damages, as allowable by law;

F.     For an award of attorneys' fees and costs, and any other expenses, including expert witness fees;

G.     Pre- and post-judgment interest on any amounts awarded; and

E.     Such other and further relief as this court may deem just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated:  October 23, 2023.

Respectfully submitted,


 /s/  *Pierce Gore*
Ben F. Pierce Gore
PIERCE GORE LAW FIRM, PC